Argued June 3, affirmed as modified; remanded October 23, 1975

ADAMSON, *Plaintiff-Respondent, v.* ADAMSON
ET AL, *Defendants, and* ADAMSON, *Defendant
in Intervention-Appellant.*
541 P2d 460

*John L. Langslet,* Portland, argued the cause for appellant. With him on the briefs were Martin, Bischoff, Templeton & Biggs, Portland.

*J. Robert Jordan,* Portland, argued the cause for respondent. On the brief were Michael R. Jordan, and Jordan & Jordan, Portland.

BRYSON, J.

This is a suit to determine the equitable interest in a land sale contract between plaintiff, a named purchaser, and defendant-intervenor who obtained the interest of a named co-purchaser. The trial court decreed that plaintiff owned two-thirds and defendant-intervenor owned one-third of the equitable interest and ordered an accounting and sale of the parties' interests. The court also awarded attorney fees to plaintiff. Defendant-intervenor appeals.

This suit is essentially a family dispute wherein the parties seek judicial interpretation of events pertaining to the equitable interest of the parties in a fourplex apartment in Portland, Oregon. Plaintiff Margaret Adamson married Brian Adamson, the only child of Joel and Inez Adamson,[1] in April of 1964. Thereafter, plaintiff and Brian, who were then living with Inez Adamson, Brian's mother, began searching for their own home in which to reside.

Brian located a fourplex for sale which he desired to purchase. He approached both of his parents to discuss the feasibility of purchasing the fourplex. After some discussion Brian, as sole purchaser, signed an earnest money agreement with the seller, Hunt. At the closing of the transaction and execution of the sales contract, Inez advanced the down payment of $5,000. A sales contract was prepared by the realtor at Brian's direction, which read in part:

"THIS CONTRACT, Made this 20th day of May, 1965, between Alden G. Hunt[2] and Nita M.

---

[1] Prior to trial Inez Adamson, a defendant, transferred her interest to her former husband, Joel Adamson, defendant-intervenor. Inez and Joel had been separated approximately eight years and were divorced in December, 1973, all prior to the time of trial. Inez T. Adamson and Nita M. Hunt, vendor, are not parties to this appeal.

[2] Alden G. Hunt is deceased.

Hunt (husband and wife) hereinafter called the seller, and Brian J. Adamson and Margaret Adamson (husband and wife) and Inez T. Adamson, hereinafter called the buyer,

"WITNESSETH, That in consideration for the stipulations herein contained and the payments to be made as hereinafter specified, the seller hereby agrees to sell to the buyer and the buyer agrees to purchase from the seller the following described real estate * * *. [Description of property omitted.]

"* * * * *.

/s/ Brian J. Adamson        (seal)
/s/ Margaret A. Adamson    (seal)
                    /s/ Alden G. Hunt    (seal)
                    /s/ Nita M. Hunt    (seal)
                    /s/ Inez T. Adamson    (seal)
                                            (seal)"

Stated in chronological order, certain exhibits were received affecting the real property involved herein:

1. May 20, 1965: Execution of the contract to purchase by Margaret and Brian Adamson, husband and wife, and Inez Adamson;

2. April 14, 1972: Deed, Brian Adamson and plaintiff, Margaret Adamson, husband and wife, to Joel Adamson, Brian's father, of interest in fourplex;

3. June 12, 1972: Petition for divorce filed, Margaret Adamson v. Brian Adamson, praying that the plaintiff's and defendant's interests in the fourplex involved herein be set aside to petitioner as her sole property;

4. April 13, 1973: Divorce decree awarding petitioner, plaintiff herein, all right, title and interest of the parties in and to the fourplex;

5. October 9, 1973: This suit filed;

6. October 24, 1973: Deed, Inez T. Adamson to Joel, defendant-intervenor, of all of her interest in and to the fourplex.

Defendant first contends that, contrary to the executed land sale contract, plaintiff and Brian had no interest in the fourplex and the court erred in so finding. He argues that both plaintiff's and Brian's names were placed "on the contract as a kind of 'insurance' if something happened to" Inez, Brian's mother; that plaintiff and Brian "would receive one-half of Inez's interest if Inez died."

■ We construe the contract and the parties' intentions in the light of circumstances existing at the time the contract was executed. *Klimek v. Perisich,* 231 Or 71, 78, 371 P2d 956 (1962); *Erickson v. Grande Ronde Lbr. Co.,* 162 Or 556, 580, 94 P2d 139 (1939). The only witnesses called to explain the execution of the May 20, 1965, land sale contract were the immediate family members, Brian, Margaret, Inez and Joel Adamson. Mrs. Hunt, the seller, was not called to testify. The testimony is conflicting and confusing. Plaintiff testified that Brian's and her interest in the fourplex "was given to us, as I understand it, for a wedding present and as a start in life, some place where we would have of our own." She further testified that she understood that she had an "owner's interest" in the fourplex. There is also testimony that Inez's name was added to the contract for the sole purpose of enabling Inez and her husband, Joel, to claim the tax benefits available to "owners" of the fourplex. It is undisputed that Brian located the fourplex to purchase, signed the earnest money receipt and that Brian and plaintiff signed as purchasers and obligated themselves to the terms of the contract. Brian and plaintiff moved into the fourplex and managed it for a period of two years before their matrimonial problems began.

Brian testified that the purchase was to have two purposes—to provide a place for plaintiff and him to live and to serve as an investment for Joel and Inez. He testified:

"A It was primarily a kind of insurance. I think I had at least one idea that may or may not have been incorrect, but as insurance if something happened to Mother, then it would—we wouldn't have, well, certain taxes, certain things that—there are certain things that must be gone through and paid if only one person's name is on a piece of property."

Brian, who had signed the earnest money agreement, instructed the real estate agent to prepare the land sale contract and testified:

"Q * * * What did you tell them?

"A That Mother's name and Margaret's and mine.

"Q Were all to go in as buyers?

"A Yes.

"Q All right, fine. And so that Exhibit 1 insofar as the name of the buyers is concerned is prepared exactly as you directed that it be prepared, is that correct?

"A It was prepared to my satisfaction."

The parties signed the land sale contract at the office of Pacific Title and Trust.

Inez testified on direct examination as follows:

"Q * * * Why was your name on the contract, Mrs. Adamson?

"A If anything happened to me, why, then Joel and Brian and Margaret would then get the house, the fourplex.

"Q By 'anything happened,' you mean if you had died?

"A If I would have died, yes."

Further, Inez testified that "they [plaintiff and Brian] signed it because I wanted it signed and that I asked them to." However, in the original answer of Inez T. Adamson, she alleges that there was "an agreement that if plaintiff improved the property by an amount equal to defendant Inez T. Adamson's investment, she [plaintiff] and Brian J. Adamson could acquire a one-half i n t e r e s t in said real property * * * ."[3]

Finally, Joel Adamson[4] testified that the purchase was to be his[5] and Inez's investment and that this was discussed with plaintiff, who made no objections at the time. In regard to the three names on the sales contract, Joel responded:

"Q All right. Now, then, Mr. Adamson, why were the names of Brian and Margaret put on this contract, Exhibit 1?

"* * * * * .

"A Because I thought it would be well to have two names on the contract, and if something—if Inez should die, for example, then she would want her interest to go to Brian and Margaret.

"* * * * * ."

At the conclusion of the trial, the trial court made findings and concluded that Inez Adamson had made the initial $5,000 down payment and stated:

"* * * [T]here is no question that this was going to be a home for the kids and they weren't just to collect the rent and cut the lawn. * * *

[3] Brian's verified answer in the 1972 divorce proceeding alleged the same facts.

[4] Joel gained familiarity with real property transactions while employed by the Bonneville Power Administration. Joel prepared some of the documents in this case and also displayed considerable knowledge regarding income taxes.

[5] Joel claimed his name was kept off the contract because he had a judgment of record against him at the time.

[T]hey [plaintiff and Brian] were going to have a little place and they were going to amortize the mortgage with a contract and they would have something"; that Brian decided "as an afterthought to include his mother's name as one of the vendees on that land sale contract, so there was an interest created in their respective names &ast; &ast; &ast;."

The court also questioned the credibility of Joel Adamson and stated:

"&ast; &ast; &ast; Mr. Adamson, of course, Joel here, is a very bright and able man, but I think there was a lot of—he was—a lot of maneuvering around here. The Court seriously questions what happened."

The court further found that plaintiff and Brian, together with Inez Adamson, were "buyers" pursuant to the contract and were owners of an equitable interest in the fourplex; that Inez Adamson had conveyed her interest to defendant-intervenor.

■ Where only interested witnesses are called to testify, where the testimony is conflicting and the evidence is in equipoise, the credibility of witnesses is decisive and we give considerable weight to the findings of the trial court even though we try the case de novo. *Royer v. Gailey,* 252 Or 369, 375, 449 P2d 853 (1969); *Cole v. Fogel et al,* 210 Or 257, 261, 310 P2d 315 (1957); *Kramer v. Taylor et al and Trickel,* 200 Or 640, 647, 266 P2d 709 (1954); *Bogle v. Paulson,* 185 Or 211, 228, 201 P2d 733 (1949); *Kallstrom v. Kallstrom,* 265 Or 481, 485, 509 P2d 1195 (1973).

■ We have reviewed all of the testimony and exhibits and although it is conflicting, we conclude that the evidence adduced demonstrates that plaintiff and Brian had an equitable interest in the fourplex as set forth in the land sale contract dated May 20, 1965.

■ The defendant-intervenor also contends that the

trial court erred in decreeing that the deed by plaintiff and Brian J. Adamson of April 14, 1972, to Joel Adamson conveying their interest in and to the fourplex real property was void and of no legal effect. He argues that the deed was given for an adequate consideration as stated in the deed, "$850.00" and other property or value.

Plaintiff contends that Brian and defendant-intervenor conspired together and through duress and coercion acted fraudulently in obtaining plaintiff's signature to said deed and in transferring the equitable interest of plaintiff and Brian in the fourplex to defendant-intervenor.

The trial court found:

"* * * It was evident to the parties as time went on when this final transaction happened here in April [deed by Brian and plaintiff to defendant-intervenor] that the marriage was on the rocks and everyone suddenly looks to their own when that happens, and Margaret here is not—relied a great deal on her father-in-law and had a high respect and trust in him. She [plaintiff] was in a state of discomfort. She was overdue with the childbirth * * *."

The court further found that plaintiff had been "threatened," and "harassment" and "coercion" had been exerted against her.

The record shows that prior to the execution of of the deed in question, defendant-intervenor became aware of two problems: (1) that his son, Brian, who had been unemployed, was having financial difficulty and was being pursued by creditors; (2) that Brian and plaintiff were having marital difficulty. Plaintiff had separated from Brian, and a divorce was imminent after plaintiff's pregnancy was terminated. It is also clear from the record that defendant-intervenor masterminded the execution of the deed in question; it

was his idea. Both his son, Brian, and plaintiff relied upon and accepted his advice and trusted him. He testified:

"Q   Mr. Adamson, up until the time Margaret separated from her husband she always trusted you and relied on what you told her, didn't she?

"A   I believe she did, yes, sir."

Plaintiff testified to the same effect and that Brian followed his father's instructions. It is clear that a confidential relationship existed between plaintiff and her father-in-law.

"'*   *   *   A confidential relationship exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind.'

"*   *   *   *   *   *.

"'*   *   *   If one person is in a confidential, but not in a fiduciary relation to another, a transaction between them will not be set aside at the instance of one of them unless in fact he placed confidence in the other and the other, by fraud or undue influence or otherwise abused the confidence placed in him.'

"*   *   *   *   *   *.

"'*   *   *   The burden of showing an abuse of a confidential relation is upon the person seeking to set aside the transaction.'" (Footnote omitted.) *Ingersoll v. Ingersoll*, 263 Or 376, 379-80, 502 P2d 598 (1972).

On direct examination Brian Adamson was asked:

"Q   *   *   *   Why did you and Margaret sign that deed to your father on the fourplex?

"A   Primarily because of the financial difficulties and I thought that we might get sued.

"Q   What did you think would happen if you got sued?

"A Well, if we were sued, I presume they would try to attach part of the apartment.

"Q Now, on the deed itself it says that the consideration was $850.00. Could you explain what that was?

"A I don't know.

"Q Did your dad actually pay you $850.00 cash? [Consideration named in deed.]

"A I don't remember anything about $850.00 dollars."

He also testified that he had discussed the matter with his father, defendant-intervenor.

The evidence shows that defendant-intervenor prepared the deed of April 14, 1972, and he arranged for its execution at the bank. On the day in question, he went to plaintiff's home and drove plaintiff and Brian to the bank without any discussion of the document and had plaintiff execute the deed before a notary public, a bank employee. Plaintiff described what occurred as follows:

"THE COURT: * * * Were you aware that you transferred your interest or whatever your interest may be in the fourplex?

"THE WITNESS: No.

"* * * * *.

"THE COURT: What did you think you were signing on the day that your husband brought you down to the bank there?

"THE WITNESS: He told me I was signing a correction—as I remember a correction to the paper I had signed earlier referring to the property sale of property on Burnside, and that is what I thought. * * *"

She further testified:

"A I had always trusted Mr. Adamson and him in our business dealings.

"Q   When you were at the bank and you signed the deed why didn't you read it, Mrs. Adamson?

"A   Because I didn't want it either in the first place. I was rather sick and I was leaning on the counter. I didn't read it. I just took their word for it.

"Q   Did you have a chance to read it?

"A   I probably could have read it, but I didn't."

Plaintiff filed her petition for divorce approximately two months after she had executed the deed of April 14, 1972. Her child was born May 5, 1972. As stated, it is abundantly clear that at the time defendant-intervenor secured the execution of the deed, both he and Brian were aware that a divorce was imminent. It is equally clear that the conveyance was made to hinder or delay plaintiff from recovering, in a divorce suit,[⊛] Brian's interest in the fourplex, his only tangible asset. Defendant-intervenor attempted to explain the consideration of $850 by stating that it was sums that he had advanced to his son after his son's marriage to plaintiff for the payment of creditors, but the evidence would indicate such payments were in the form of a gift, not uncommon between parents and children during marriage difficulty.

In plaintiff's divorce suit against Brian Adamson (file was received as an exhibit in this suit), she prayed that she be "awarded as her sole and separate property all of the right, title and interest of the parties in and to" the fourplex involved herein. The divorce decree granted her this relief.

---

[⊛] ORS 95.070 provides:

"Every conveyance * * * of any estate or interest in lands * * * made with the intent to hinder, delay or defraud creditors *or other persons* of their *lawful suits,* damages, forfeitures, debts or demands, * * * as against the person so hindered, delayed or defrauded is void." (Emphasis added.)

In *Weber v. Rothchild,* 15 Or 385, 388-89, 15 P 650, 2 Am St Rep 162 (1887), we held that a person in the position of plaintiff may maintain a suit to set aside a transaction which may defeat her recovery and rights in a contemplated suit for divorce. *See also Bosma v. Harder,* 94 Or 219, 230-32, 185 P 741 (1919); *Burnett et al v. Hatch,* 200 Or 291, 266 P2d 414 (1954). This rule prevails in other jurisdictions that have considered the matter. See Bigelow, The Law of Fraudulent Conveyances 168, 173 (1911); Note, 14 Albany L Rev 102, 103-04 (1950); Annot., 49 ALR2d 521, § 10 at 556-58 (1956); 37 Am Jur 2d, Fraudulent Conveyances § 133 (1968).

We conclude, as did the trial court, that the conveyance by deed of April 14, 1972, was obtained by fraud to hinder or prevent plaintiff's recovery of Brian's equitable interest in the fourplex, in the divorce suit, and is therefore set aside and held to be void.

■ The trial court reached the same conclusion on the facts as we have but decreed that "plaintiff is the owner of an undivided two-thirds (2/3) and defendant in intervention is the owner of an undivided one-third (1/3) of the equitable interest of the buyers in and to the following described real property under the terms" of the land sale contract.

Defendant-intervenor contends "[w]hatever interest Brian and Margaret may have had under the contract (if any) was taken by them as an entity, as tenants by the entirety. * * * They had at the most a one-half interest as tenants by the entirety, and Inez Adamson held a one-half interest individually," which she conveyed to defendant-intervenor. We agree. The concept of tenancy by the entirety is that the husband and wife are but one person in the law.

"Estates by the entireties are creatures of the

common law created by legal fiction and based wholly on the common-law doctrine that the husband and wife are one, and, therefore, there is but one estate and, in contemplation of law, but one person owning the whole. * * *" (Citations omitted.) 4 Thompson on Real Property 49-52, § 1784 (1961 Replacement).

4A Powell on Real Property § 622 (1974) states, at page 688:

"Complications arise when the conveyance of land runs to *H* and *W* and a third named person, or to *H* and *W* plus a second couple, *H* and *W*. The historical unity of husband and wife is apparent in the tendency of courts to award each couple only a single share under such a conveyance." (Footnotes omitted.)

*See Mosser v. Dolsay,* 132 NJ Eq 121, 27 A2d 155, 157 (1942), an often cited case. The reason for the above rule is recognized in *Brownley v. Lincoln County,* 218 Or 7, 10, 343 P2d 527 (1959).

■ We find that by virtue of the decree which dissolved the marriage of plaintiff and Brian and awarded plaintiff all of Brian's interest in the fourplex (ORS 107.105(1) (e)), plaintiff holds an undivided one-half equitable interest in the fourplex pursuant to the land sale contract. Defendant-intervenor, by virtue of the deed from Inez, holds the remaining undivided one-half equitable interest.

The defendant-intervenor also contends that the court erred in granting plaintiff attorney fees. Plaintiff contends that this is a partition suit and she is entitled to attorney fees as provided in ORS 105.405.⑦

---

⑦ ORS 105.405:

"* * * * *.

"(2) The reasonable costs of partition, including reasonable attorney fees and disbursements, that are for services per-

In *Brusco v. Brusco,* 241 Or 550, 555, 407 P2d 645 (1965), a partition suit, plaintiff contended that the trial court erred in failing to award attorney fees pursuant to the above statute. We stated:

"* * * The record shows that most, if not all, of the plaintiff's attorneys' work was necessitated by the controversy over the amount, if any, for which plaintiff was entitled to reimbursement and, therefore, was not for the 'common benefit of all parties.' * * *"

■■ Plaintiff originally brought this suit as one in partition against Inez T. Adamson. Before trial Inez had conveyed her interest to the defendant-intervenor. After defendant-intervenor filed his pleading praying that he be decreed to be the sole owner of the equitable interest in the land sale contract, the plaintiff filed her pleading joining issue with the defendant-intervenor. The suit then became one to determine the equitable interests of the respective parties in and to the equitable interest in the land sale contract. It was not tried as a suit in partition. Therefore, plaintiff cannot recover attorney fees under the statute relied upon. Plaintiff also seeks allowance of attorney fees under the broad equitable rule announced in *Gilbert v. Hoisting & Port. Engrs.,* 237 Or 130, 384 P2d 136, 390 P2d 320 (1963), *cert. den.,* 376 US 963, 84 S Ct 1125, 11 L Ed 2d 981 (1964). In *Gilbert v. Hoisting & Port. Engrs., supra,* plaintiffs, as representatives of all of the members of the local union, brought suit in equity for the appointment of a receiver, an accounting and other relief. We find nothing in the record of this case which would bring it within the equitable principles of *Gilbert.* Accordingly, the plaintiff is

formed for the common benefit of all parties, shall be paid by the parties decreed to share in the lands divided in proportion to their respective interests therein, and shall be included and specified in the decree. * * *"

not entitled to recover attorney fees in this suit, and the court erred in this respect.

Costs to neither party; affirmed as modified and remanded to the trial court for further proceedings not inconsistent herewith.